# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**JEFFREY D. LEISER,**

    **Plaintiff,**

  v.                                   Case No. 19-CV-676

**CINDY BARTER and**
**CARRI KARSCHNEY,**

    **Defendants.**

## DECISION AND ORDER

Plaintiff Jeffrey D. Leiser, a Wisconsin state prisoner who is representing himself, filed this lawsuit under 42 U.S.C. § 1983. This court screened his complaint, dismissed it for violating Federal Rules of Civil Procedure 18 and 20, and ordered Leiser to file an amended complaint. (ECF No. 7.) Leiser complied and sued three defendants in an amended complaint. (ECF No. 8.) The court screened the amended complaint and allowed Leiser to proceed on an Eighth Amendment claim against Registered Nurse Cindy Barter. (ECF No. 12.) Leiser moved to further amend his complaint to state additional claims against Correctional Officer Carri Karschney. (ECF No. 16.) The court granted Leiser's motion to amend and permitted him to proceed under the Eighth Amendment against Karschney. (ECF No. 17.)

The defendants now move for summary judgment. (ECF No. 24.) Leiser opposes the motion. (ECF No. 32.) The motion is fully briefed and ready for resolution. All parties have consented to magistrate judge jurisdiction. (ECF Nos. 4, 15.)

## BACKGROUND

The facts in this section are taken from the defendants' proposed findings of fact (ECF No. 26) and their declarations in support (ECF Nos. 27–28); Leiser's response to the defendants' proposed findings of fact (ECF No. 33) and additional proposed findings of fact (ECF No. 35); and the defendants' response to Leiser's proposed facts (ECF No. 38). The court will consider each party's proposed facts only to the extent they are supported by evidence in the record and will deem admitted any facts that a party has not properly contested. *See* Fed. R. Civ. P. 56(c)(1); Civil L. R. 56(b)(1)(C)(i), (b)(2)(B)(i)–(ii), and (b)(4); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("We have consistently held that a failure to respond by the nonmovant as mandated by the local rules results in an admission."). The court will consider arguments in the supporting memoranda only to the extent they properly refer to each party's statement of facts. *See* Civil L. R. 56(b)(6).

### A. The Parties

Leiser is and was at all times relevant to this lawsuit an inmate at Redgranite Correctional Institution ("RGCI"). (ECF No. 26, ¶ 1.) Both defendants worked at RGCI at all relevant times, Karschney as a correctional officer and Barter as a registered nurse. (*Id.*, ¶¶ 1–2, 8.)

2

### B. Leiser's Complaints

Because Leiser's complaints are verified, the court will treat each as "the equivalent of an affidavit" for purposes of this decision. *See Devbrow v. Gallegos*, 735 F.3d 584, 587 (7th Cir. 2013); *Ford v. Wilson*, 90 F.3d 245, 246–47 (7th Cir. 1996).

In his amended complaint Leiser stated that he was transferred to RGCI from New Lisbon Correction Institution on August 30, 2018. (ECF No. 8, ¶ 3.) His property, including his CPAP breathing machine,[1] was taken to the Health Services Unit ("HSU"). (*Id.*, ¶ 4.) Leiser told Karschney that evening that he needed his CPAP machine to sleep and without it he would stop breathing during the night while he slept. (*Id.*) Karschney told him "to submit a blue slip." (*Id.*) A "blue slip" is a request for treatment sent to the HSU. (ECF No. 32-14, ¶ 3.) Leiser slept that night without his CPAP machine and woke up the next morning with the feeling of something caught in his throat. (ECF No. 8, ¶ 5.) He told Barter at orientation that morning that he needed to be seen for medical treatment, and Barter also told him "to put in a blue slip." (*Id.*, ¶ 6.) He showed Barter that he was bleeding, but she still refused to give him aid. (*Id.*) Leiser states that at 12:55 p.m. he received treatment at the HSU for irritation to his uvula. (*Id.*, ¶¶ 7–10.) He was hospitalized that afternoon, and an Ear, Nose, and Throat Specialist unsuccessfully cauterized his uvula before determining

---

[1] A Continuous Positive Airway Pressure ("CPAP") breathing machine helps people who have breathing difficulties while they sleep, especially pauses in breathing associated with sleep apnea. *Johnson v. Tannan*, No. 19-C-645, 2020 WL 1689791, at *1 (E.D. Wis. Apr. 7, 2020).

that it needed to be removed. (*Id.*, ¶¶ 11–13.) When he returned to RGCI, his CPAP machine was waiting for him at the HSU. (*Id.*, ¶ 14.)

In his second amended complaint Leiser did not reiterate his allegations against Barter, noting that the court "already allowed Leiser to proceed against Defendant Barter." (ECF No. 18 at 1.) He stated that Karschney knew about an inmate's need for a CPAP machine and had a duty to inform the HSU of any serious medical need that an inmate brings to her attention, which included his need for a CPAP machine. (*Id.*, ¶ 4.) He reiterated that Karschney did not fulfill her duty to contact the HSU and instead simply told Leiser to submit a blue slip about his CPAP machine. (*Id.*, ¶ 3.) He slept that night without his CPAP machine and suffered the injury leading to the removal of his uvula. (*Id.*, ¶ 7.) Leiser asserts that, "[b]ecause of defendant Barter & Karschney," he lost his uvula and now frequently chokes on food and water and suffers emotional distress. (*Id.*, ¶ 8.)

### C. Leiser's Arrival at RGCI and his CPAP Machine

Karschney worked in the Property Department at RGCI on August 30, 2018, from 6:00 a.m. until 2:00 p.m., when the Property Department closes. (ECF No. 26, ¶ 2.) She states that, if an inmate's CPAP machine was packed in a box, she would not know it was inside unless she opened the box. (ECF No. 28, ¶ 6.) If she found an inmate's CPAP machine, it was her practice to send it to the HSU. (*Id.*; ECF No. 26, ¶ 3.) Any unopened boxes would remain in the Property Department when it closed for the day. (ECF No. 28, ¶ 6.)

In response to Leiser's requests for admissions, Karschney denied knowing what a CPAP machine is, what one does, and whether a person using a CPAP machine would stop breathing while sleeping without it. (ECF No. 32-2.) Leiser states that his CPAP machine was not placed in a box but was placed in its carrying case and set atop other boxes. (ECF No. 35, ¶ 2.) He disputes that it was Karschney's practice to send CPAP machines to the HSU. (ECF No. 34, ¶ 1.)

Karschney also worked the second shift on August 30, 2018. (ECF No. 26, ¶ 4.) She states that Leiser did not ask her about his CPAP machine that day and that, if he had, she would have contacted a supervisor and asked someone to retrieve the machine and take it to the HSU. (*Id.*, ¶¶ 5–6.) Karschney states that she "never tells inmates to submit blue slips to get their medical property" and did not tell Leiser to submit one to receive his CPAP machine. (*Id.*, ¶ 7.)

Leiser disputes Karschney's statements and asserts that he asked her around 7:00 p.m. on August 30, 2018, about his CPAP machine. (ECF No. 35, ¶ 4.) He told her that he needed it because he stops breathing when he sleeps. (*Id.*, ¶ 5.) Leiser asserts that Karschney refused to call the HSU or her supervisor to obtain his CPAP machine and instead twice directed him to submit a blue slip. (*Id.*) He states that Karschney violated RGCI policy by not contacting her supervisor. (*Id.*, ¶ 7.) He was forced to sleep that night without his CPAP machine and woke up spitting up blood and with the feeling that something was choking him. (*Id.*, ¶¶ 6, 9.)

### D. Treatment of Leiser's Uvula

In the morning of August 31, 2018, Barter worked at RGCI in the HSU for an inmate orientation session. (ECF No. 26, ¶ 8.) During orientation Barter asked the inmates not to discuss personal health issues and to reserve questions for an appointment with the HSU unless there was an emergency. (ECF No. 32-5 at 3.) She also instructed the group to report urgent medical needs to the staff of their housing unit. (ECF No. 32-11 at 2.) Barter states that at the end of orientation "an inmate" raised his hand and "calmly" requested to be seen in the HSU. (ECF No. 27, ¶ 6.) She states that there was no indication that the inmate was choking, and his speech was "non-pressured" and "clear with a regular rate, tone, and rhythm." (*Id.*, ¶ 7.) Barter states that the inmate did not explain his reason for wanting to be seen in the HSU and did not state that he was choking, bleeding from his throat, having trouble breathing, or experiencing an urgent medical issue. (*Id.*) Barter does not refer to this inmate as Leiser. But she stated in an email in response to Leiser's inmate complaint against her that she did not recall Leiser having issues swallowing during the orientation session. (ECF No. 32-5 at 3.)

Leiser disputes Barter's version of the facts. He states that he did not raise his hand but approached Barter after orientation and asked to be seen by the HSU. (ECF No. 35, ¶ 22.) He states that he told her he was choking and spitting up blood. (*Id.*, ¶ 10.) Leiser asserts that he gargled every time he spoke, and he even spit in a cup to show Barter that he was bleeding. (*Id.*, ¶¶ 11–12.) He states that, despite his

6

symptoms, Barter did not further investigate his condition or send him to the HSU. (*Id.*) Leiser asserts that Barter's actions violated RGCI policy. (*Id.*, ¶¶ 28–30.)

It is undisputed that Leiser was seen in the HSU at 12:55 p.m. that day. (ECF No. 26, ¶ 11; ECF No. 35, ¶ 14.) Leiser's treatment notes show he complained "my uvula is falling off" and told HSU staff it was difficult to breathe and painful to swallow. (ECF No. 32-6 at 1.) The nurse (who is not a defendant) noted that Leiser's breathing was unlabored, his speech was "[g]arbled," and his uvula appeared swollen and bloody but was not actively bleeding. (*Id.* at 1–2.) Leiser told the nurse his condition was "because they wouldn't give me my CPAP." (ECF No. 32-6 at 3.) It is undisputed he was taken to a medical center in Berlin, Wisconsin, before being transferred to the University of Wisconsin–Madison hospital, where his uvula was eventually removed. (ECF No. 38, ¶¶ 32–33; ECF No. 32-9.) He returned to RGCI on September 1, 2018, and HSU staff noted no bleeding at that time. (ECF No. 38, ¶ 34; ECF No. 32-10.) Leiser states that he now has problems swallowing and choking on food that enters his nasal cavity when he swallows. (ECF No. 35, ¶¶ 38–39.)

## SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment if it shows that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* The court

7

must construe the evidence in favor of the non-moving party and draw "all justifiable inferences" in his favor. *Id.* at 255. "[D]isputed facts that are not outcome-determinative are not material and will not preclude summary judgment." *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010).

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To survive a motion for summary judgment a non-moving party must show that sufficient evidence exists to allow a jury to return a verdict in its favor. *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

## ANALYSIS

As an initial matter, the defendants assert that Leiser has forfeited his claims against Barter because he did not replead his allegations against her in his second amended complaint. (ECF No. 25 at 5–6 & n.1.) They contend that the second amended complaint superseded rather than supplemented the first amended complaint, and Barter must be dismissed as a defendant. (*Id.*)

The defendants are correct that an amended complaint normally supersedes an initial complaint and must be complete in itself. Leiser labeled his second amended complaint a "first amended motion" under Fed. R. Civ. P. 15, and the court reviewed it under Rule 15. (ECF No. 16; ECF No. 17 at 1–2.) But Leiser noted in his second amended complaint his intent to proceed against Barter and that he had not realleged his claims against her because "the court granted Leiser [sic] to proceed against her."

8

(ECF No. 16, ¶ 9.) The court concluded that Leiser stated a claim against Karschney but did not dismiss the claims against Barter that it had previously allowed to go forward. It was clear from the court's orders that the claims against both Karschney and Barter were proceeding, and Barter does not allege she was prejudiced by or inadequately notified of the claims against her. Because Leiser is proceeding *pro se*, the court will not strictly hold him to amendment rules as it would a party represented by counsel. *See Donald v. Cook Cty. Sheriff's Dep't*, 95 F.3d 548, 555 (7th Cir. 1996) (reinforcing that district courts must "take appropriate measures to permit the adjudication of *pro se* claims on the merits, rather than to order their dismissal on technical grounds"). The court will therefore review the merits of the claims against both defendants.

### A. Eighth Amendment Claim

The court reviews Leiser's claims regarding the denial of medical care under the Eighth Amendment, which "protects prisoners from prison conditions that cause the wanton and unnecessary infliction of pain, including . . . grossly inadequate medical care." *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1033 (7th Cir. 2019) (quoting *Pyles v. Fahim*, 771 F.3d 403, 408 (7th Cir. 2014)) (internal quotations omitted). To state a valid Eighth Amendment claim the inmate must allege both that he "suffered from an objectively serious medical condition" and that the defendants were "deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)); *see Estelle v. Gamble*, 429 U.S. 97, 103 (1976). "[D]eliberate indifference describes a state of mind

9

more blameworthy than negligence." *Farmer*, 511 U.S. at 835. A prison official shows deliberate indifference when she "realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015) (citing *Farmer*, 511 U.S. at 837).

The defendants do not dispute that Leiser suffered from an objectively serious medical condition. The only question is whether each defendant was aware of his condition and disregarded a substantial risk of serious harm to his health or safety.

### 1. Officer Karschney

A genuine dispute exists as to whether Leiser asked Karschney about his CPAP machine on the evening of August 30, 2018. Karschney states that Leiser said nothing about it. But Leiser asserts he told her he needed the CPAP machine because he stops breathing when he sleeps and that Karschney did not call the HSU or her supervisor to obtain his machine. He also asserts that Karschney knows what a CPAP machine is and what it is used for. Karschney denies having that knowledge. Leiser asserts that Karschney told him to submit a blue slip to be seen by the HSU, a statement Karschney also denies. There is no evidence that Leiser submitted an HSU request on August 30, 2018.

A reasonable jury could accept Leiser's version and conclude that Karschney was indifferent to Leiser's serious medical need by not contacting the HSU or doing more to address his concern.

10

### 2. *Registered Nurse Barter*

A genuine dispute exists about what Leiser told Barter during orientation on August 31, 2018. Barter admits that she did not treat Leiser but states that Leiser showed no signs of distress, had no difficulty breathing or swallowing, and spoke calmly without expressing an urgent need for medical care. Leiser states that he told Barter he was choking, was spitting up blood, and needed to see the HSU. He states he gargled when he spoke with her. Leiser states that he also showed her his bloody saliva, yet she neither treated him nor took him to urgent care, simply telling him to submit a medical request slip. Leiser has presented sufficient evidence from which a jury could conclude that Barter was subjectively aware of Leiser's serious medical situation and failed to assist him or take him for immediate treatment.

## B. Qualified Immunity

The defendants assert that they are entitled to qualified immunity. Qualified immunity "'protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Figgs v. Dawson*, 829 F.3d 895, 905 (7th Cir. 2016) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation omitted)). Qualified immunity is an affirmative defense. Once raised, the plaintiff must show that the defendants violated his constitutional right and that the right at issue was clearly established at the time of the violation. *Pearson*, 555 U.S. at 232.

To show that the law is clearly established, Leiser must "show either a reasonably analogous case that has both articulated the right at issue and applied it to a factual circumstance similar to the one at hand or that the violation was so obvious that a reasonable person necessarily would have recognized it as a violation of the law." *Leiser*, 933 F.3d at 701 (quoting *Howell v. Smith*, 853 F.3d 892, 897 (7th Cir. 2017)). "The clearly established law must be 'particularized" to the facts of the case.'" *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). It is not necessary that there be cases "directly on point," but "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 551 (internal quotation marks omitted).

The defendants contend that Karschney is entitled to qualified immunity because no case law establishes she was required to take Leiser's word about his medical need absent "actual knowledge of the need from medical staff." (*Id.* at 2.) They assert that Barter is entitled to qualified immunity because Leiser has no right to immediate treatment or to avoiding a two-to-three hour wait to be seen, "even for a traumatic injury." (*Id.* at 3.)

It was clearly established long before August 2018 that a prison official who "realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk," has shown deliberate indifference to that inmate. *Perez*, 792 F.3d at 776 (citing *Farmer*, 511 U.S. at 837). Even without knowledge from medical staff about Leiser's medical needs, there is a dispute about whether Karschney knew what a CPAP machine is used for and whether Leiser told Karschney that he needed

12

to use a CPAP machine to keep him breathing while he slept. It is immaterial whether the knowledge of the risk to Leiser's health came from him or medical staff. Because a reasonable jury could conclude that Karschney knew of the substantial risk to Leiser's health but did nothing to address it, she is not entitled to qualified immunity.

Regarding Barter, the question for purposes of qualified immunity is whether it was clearly established in August 2018 that Barter was constitutionally required to provide Leiser with *immediate* medical care based on his description of his symptoms. It was established at the time of these events that Barter, a nurse in a correctional facility, had a constitutional obligation to provide inmates medical care. *See Terry v. Cty. of Milwaukee*, 357 F. Supp. 3d 732, 749 (E.D. Wis. 2019) (citing *Estelle*, 429 U.S. 97, and *Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996)). But Leiser has not provided any caselaw clearly establishing that Barter was constitutionally required to provide him with *immediate* treatment for problems of the type described by Leiser. Leiser told Barter in the morning that his throat hurt. He reported to the HSU for treatment of his uvula at 12:55 p.m. that same day. Leiser was transferred to a hospital, where a specialist treated his uvula.

Absent prior authority showing that under these circumstances a prisoner must receive immediate treatment from a doctor, a reasonable nurse in Barter's position could not have known that making Leiser wait a few hours for treatment was a violation of his constitutional rights. She is entitled to qualified immunity.

### C. Prison Policy

Leiser also asserts that the defendants' actions violated prison policy and procedures. But the violation of prison policy does not state a claim under § 1983. *See Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001); *see also Estate of Simpson v. Gorbett*, 863 F.3d 740, 746 (7th Cir. 2017) (quoting *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003)) (noting that § 1983 "protects against 'constitutional violations, not violations of . . . departmental regulation[s] and . . . practices'").

### D. Objection to General Order 20-8

Leiser submitted an "objection" to General Order 20-8, entered by Chief Judge Pamela Pepper on April 9, 2020. (ECF No. 39.) The general order granted an *ex parte* motion filed by the Wisconsin Department of Justice to extend deadlines in civil prisoner litigation cases because of the COVID-19 pandemic. *See* https://www.wied.uscourts.gov/general-orders/granting-extensions-time-prisoner-cases-general-order-20-8. Leiser asserts that General Order 20-8 violated his rights under the Fourteenth Amendment because it was filed and decided *ex parte*, and he did not receive a copy of the general order until April 17, 2020. (*Id.* at 1.) He contends that the general order allowed the Department of Justice "more time to prolong" summary judgment in his case. (*Id.* at 2.)

Leiser's objection is frivolous. The deadline for dispositive motions in his case was June 19, 2020. (ECF No. 23.) The defendants filed their motion for summary judgment on February 26, 2020, more than a month before General Order 20-8 went into effect. Leiser did not move for summary judgment. The defendants did not

14

request extra time under the General Order to submit any materials. But the court did grant Leiser's request for additional time to submit his response materials, in which he asserted that RGCI had limited his law library access in response to the pandemic. (ECF No. 30.) The court explained that Leiser could request "additional extensions" of time if needed. (ECF No. 31.) Leiser did not request additional time and submitted his response materials over a week before the deadline. The defendants submitted their reply brief five days later, eleven days before the deadline. Leiser fails to show how he was prejudiced by General Order 20-8, which did not affect the deadlines in his case or unfairly allow the defendants more time to submit their summary judgment materials. Nor was it a violation of his due-process rights for the court to enter the emergency order during and in response to this crisis.

## CONCLUSION

**IT IS THEREFORE ORDERED** that the defendants' motion for summary judgment (ECF No. 24) is **GRANTED in part and DENIED in part**. Summary judgment is granted for Defendant Barter, and she is **DISMISSED**. Summary judgment is denied for Defendant Karschney.

The court will enter a separate order setting a status conference to discuss the next steps in this case.

Dated at Milwaukee, Wisconsin this 6th day of July, 2020.

WILLIAM E. DUFFIN
U.S. Magistrate Judge

15

Case 2:19-cv-00676-WED   Filed 07/06/20   Page 15 of 15   Document 42